First case up this morning is 4-11-0-9-5-6. Halmick v. Lambright. For the appellant is Ken Fulmer. You ready, sir? Yes, Your Honor. For the appellee, Christopher Tietz. Okay. Mr. Fulmer, your name, sir. Thank you. My name is Kent Fulmer. I represent the plaintiffs in the original action, Joshua and Alyssa Halmick. This case involves an easement for a shared driveway in Champaign County. It was a typical case where there was an original lot that was subdivided into two and then the previous owners used it in such a fashion without any problem when there was first the sale to a non-family member that parties thought it would be appropriate to record an easement. This case is about the interpretation of that easement and I intend to briefly highlight just a few of the exhibits in the separate appendix and then discuss the reasons why the trial court erred when it entered the declaratory judgment that it did. Initially, it's important to visualize what this driveway looked like. I refer to A66 and A67 in the appendix. These two aerial photographs were taken before and after the easement was recorded and particularly at A67, you can see the interior of the gravel drive. The area of this dispute on A67 Plaintiffs' Exhibit 85 is the area just south of, excuse me, just north of the driveway in the area where the 57 appears. The Helmicks' house is where the 008 is in the south and the Lambrights' house is in the middle of the circle drive. Turning briefly to A68, you can see in 2005, no changes. There's a clearly delineated line on the inside of the semicircle as it goes east of the house back to the Helmick residence and that curves to the west. Then A69, you can see that the Lambrights have moved in. The house has now a garage behind it on Lot 1 and the interior line there in the gravel drive is no longer clearly set forth. There has been some growth and then the construction starts in 08. A71, flipping a couple pages over, you can see the gates that go up, the rocks that were there, the wooden fence, and all of this, your honors, is in the middle of the gravel driveway east of the house. And I emphasize east of the house because the easement at issue references along the easterly side of the improvements. And that's where the potential ambiguities arise, what are the improvements, and what does easterly mean? Now, A72 is an important aerial shot from the roof of the Helmick residence. You can see the concrete driveway there. This concrete driveway with Joshua Helmick's van is critical to the use of the easement. In order for cars to go in and out of this driveway, there must be a place for these vehicles to turn around. And that is why actual use becomes so significant. The final picture in this preliminary review, I ask you to note A26 is the proposed 10-foot wide survey that David Phillippe, the professional engineer, prepared the day after the original order entered by Judge Leonard. At the top it says September 21, 2010. Again, A26, it says proposed 10-foot wide easement to be staked per Judge's order. The reason why this diagram is important is that it shows where the easement actually was ordered in relation to the concrete approach, in relation to the fence that is marked with the F line, and it's way east of the house, and it is east of the concrete approach. And what we have is, on A27, a blow-up version of this. The uniform width of 10 feet really substantially and materially altered this easement. It prevents the plaintiffs, Mr. and Mrs. Helmut, from using it as it was used for 25 years. And this exhibit at A27 is a little bit easier to see the importance that they'd be able to get in and out using the concrete approach to the garage. If the easement does not take the vehicles to the garage, it's not proper. And for some reason, the court disregarded a substantial amount of uncontradicted and reliable testimony from an engineer, David Phillippe, from a grantee of the easement, William Huston, and Vicki Cook, who was instrumental in the creation of the subdivision. She lived in the house that the Helmuts now live in for a number of years, and she testified consistently with William Huston and the plaintiffs in this case. The final document here that is extremely important in understanding the testimony in the case is the Plaintiffs' Exhibit 83. It's a large exhibit that I have copied and attached as A65. There's different colors on it, and this particular document is interesting because each of these colors represents something important from a different kind of witness. And the blue line is the line that David Phillippe drew based upon a professional degree of engineering certainty that represents the interior of the gravel drive in 1994. And he utilized numerous exhibits going back to the original creation of the subdivision, which he was also directly involved in. The yellow line that is faint, that goes from the concrete approach over to the west on the A65 where it goes to the word gravel, that William Huston and Vicki Cook both testified, this is how they did their egress back to the road, and that is, again, for 25 years. And Vicki Cook was the witness that drew it there, and William Huston testified, and so did the plaintiffs, that this is how they utilized the easement. So this case truly does boil down to actual use to help explain what the intent of the parties was with respect to the creation of the easement. And when the court limited the width at the southern third, again, substantially altering, and he relies upon a laudable gesture of the defendant to consent to a willingness of a 10-foot uniform width. I couldn't find it in the record, but defendant Larry Lambre admitted that the easement widens out at the back to 26 feet, plus or minus. So not only did Judge Leonard's comment come from a unilateral modification, which is not allowed in easement law, but the defendant himself admitted that it widens out. David Phillipi testified it widens out at the southern part, consistent with the blue line that goes to the west. And so there's no conflicting evidence, and it's uncontradicted. And for some reason, we end up with an easement way too far to the east as far as the western border. The eastern border of that easement is consistent with the gravel drive that goes straight back, but it cannot be a uniform width of 10 feet. That's the biggest reason why the declaratory judgment should be reversed, because it's simply not functional. It's inconsistent with the easement itself. The express easement specifically says, along the easterly side of the improvements, there is no reference whatsoever to a uniform width. All of the witnesses say it widens out, both plaintiffs and defendants and David Phillipi. And so it really boils down to doing what is proper here, and that is the standard with respect to a declaratory judgment. And the cases are many, but with respect to the central issue in this case, the Vallis, Purvix, and Peters line of cases not only stand for the proposition that actual use defines an easement when that easement does not have the stated width. That's very important in this case, because our easement doesn't contain a width, but it also says once an easement is fixed, it can't be changed. It can't be changed by one party, and it shouldn't be changed by a judge, and that's exactly what happened in this case. The first alternative is addressing the issue of whether or not there is an ambiguity in the first place. Judge Latter went back and forth a little bit on that issue, and he listened to all the testimony and then admitted that there was an ambiguity with respect to its width, but it's unambiguous with respect to its course. Well, it's where he ruled the course is the same thing as the width, because you cannot limit the width of this easement without modifying its course. And so there clearly is an ambiguity with respect to what is meant by easterly sign. There's ambiguities with respect to what is meant by the word improvements. The word improvements is plural, and there is only one house. Even if the court would rule that the house is the improvement, all of these pictures of the fence directly across the driveway, the metal gate and the rocks, all of that is east of the house, and it's in the middle of the driveway, directly north of the concrete approach. And so with or without an ambiguity, there's clearly extrinsic evidence that clearly and unequivocally explains what the intent of the parties was in this case. The trial court heard several days of witnesses in this case. Did it not? Am I correct in that? Yes, they were spread out different days, sometimes half days, sometimes full days. But yes, the court heard a lot of evidence, Your Honor. So was this a question of fact being presented to the court for resolution? Well, the question of fact presented to this court is the, what is the- Presented to the trial court, is my question. Well, the question presented to the trial court, Your Honor, was what does the easement mean, whether it's ambiguous, and what did the parties intend? And then most of the evidence went to the issue of actual use. And so that was a very important question of fact. Well, having heard all these witnesses, where did the trial court go wrong in your judgment as far as putting it all together? He declared that one of the defendants consented to the laudable gesture of a uniform width of 10 feet that is unsupported by any evidence whatsoever. That's where he went wrong initially. And therefore, substantially altering the path limiting plaintiff's property right as was used for 25 years. And so I hope I answered your question, Your Honor. Well, I'm trying to understand. You mean he just constructed this out of whole cloth that the easement's limited to 10 feet? Yes. No one testified to any of that? Absolutely not, Your Honor. And the reference to the laudable gesture of one of the defendants, my staff and I searched every page of every volume. And what I found was Larry Lambright admitting that it widens at the southern end to 26 feet. And the Exhibit 83 has a scale and the width is more like 35 feet if you take the concrete approach over to where Vickie Cook and William Huston did their turnaround. So in your position before this court, what should the trial court have concluded from this evidence? The trial court should have held, the trial court had options on which way he wanted to, which law he wanted to rely upon. He could simply go on the express easement and rule that easterly side of the improvements is you cut the law in half and yes, they get to use it as they have for 25 years. They could have said that, well, there's an ambiguity, we're going to hear extrinsic evidence, and then you get the same result. And so there was alternatives, but what happened was something entirely different and it was not based upon fact or law. I'll reserve a few minutes here for rebuttal if I may. Well, you have five minutes in rebuttal no matter what. You have 20 minutes in the initial argument. Okay, thank you, Your Honor. Well, the other points more or less fall on how the court would rule with respect to the declaratory judgments. Now, in terms of the third section of the brief and the issues presented, whether the trial court erred with respect to denying of the permanent injunctive relief, what happened was the trial court simply said we have a uniform easement of 10 feet and he pushed it too far to the west and said that the defendants should not unlawfully violate the easement, and that's it. And so immediately thereafter, the defendants built a fence all the way up to that 10-foot mark, and that's the photograph with the wood fence going directly across the easement. And so we have a court that denied injunctive relief and just gave more or less a vague order, and when you're dealing with the sort of dispute that we're dealing with here, I don't think that was sufficient to resolve the actual controversies. We need a clear order with injunctive relief that allows the plaintiffs to utilize their easement as it was intended and so that we could resolve this issue for future landowners. That's a very important issue, and the plaintiffs are not appealing the denial of punitive damages. We only are asking the court for what they purchased when they bought the land from William Huston, and that's the ability to get in and out to their house to the busy street of Lake of the Woods Road. And there was some testimony about the elevation of the road at that area, and there was topographic maps, I think with Exhibit 2, where David Phillippe testified that it goes up, there's a photograph in the record. But nevertheless, Judge Leonard indicated that he didn't think that would be a problem, that there's no evidence that you can't back up to the road safely. When Vicki Cook specifically testified when she did the subdivision, the county insisted that the easement be recorded so that there wouldn't be a safety issue. And as it stands right now, my clients have been going in and out of that driveway in the snow and everywhere else backwards with boulders on either side, and it's been very, very difficult. The issue of intentional encroachment is here. It's not terribly critical now that punitive damages are not at issue any further, but what we do have is the fact that when you have intentional encroachments, it is relevant to the burden of proof on a permanent injunction. So it lessens the burden. The court is no longer obligated to balance the equities and ownership. This court can do whatever it thinks is appropriate on the injunctive relief to help resolve the controversies. Thank you very much, Judge. Thank you, counsel. Mr. Teets? May it please the court, counsel. I'll take that last point up first. Once the easement was determined by Judge Leonard, and Judge Leonard ordered that the easement as defined be, A, that any encroachments there be removed, and that the Helmlich's use of the easement is not to be obstructed. Nothing else needed to be done with respect to that. I mean, if this court would decide that the easement was improperly determined, then something else probably needed to be done. I don't think that needs to be addressed here in any way. So are the obstructions to the easement now removed? Yes. And what about the argument you just heard, that the easement doesn't permit anyone to turn around, so they have to back in and out if they're going to pull in? What about that? Well, I disagree with that assessment, but I think they're able to turn around on their own property. Well, I wanted to ask you about that. I didn't ask Mr. Fulmer that. So you believe that having traversed the easement to get to their property, they could do something up there to widen the driveway of their own property to let them turn around? Yes. Have they ever done that? No. Was there any discussion about that, that trial, as to why don't you do that? I don't believe so. Where did the 10-foot come from? You heard Mr. Fulmer's remarks about that. I think that's accurate, although I must say that I think the plots clearly show that the driveway from where it goes in the road before it becomes a circle drive towards the end of the property was approximately 10 feet in width. And I think that's where it came from. We'll leave it the way it is. I'm not sure I understood. It was 10 feet where again? As one came into the property from the road. Off of Lake of the Woods Road? Yes. There it was approximately 10 feet in width in general. And I think the court wanted to give it defined width and chose that based on what it saw. And there were parts of it where it was actually narrower. I think we can see that from the pictures. And the court said that's laudable that you would expand it out to the 10 feet. I think that's where the 10 feet came from. Go ahead. All right. Well, first of all, we have to look at the standard of review. And I don't think there's any question that it's de novo with respect to what the easement is. And it's an easement for ingress and egress. That means to get in and get out. It's for nothing more. Now, the discretion I think here, the only issue is where is it? For an example, if one had an easement of 10 feet in width as defined by the document creating the easement and that was a ditch, case law is clear that one could not say, well, it's now the 10 feet to the side of this ditch. That's the responsibility of the dominant property holder to go over the servant property. And even if he did that, even if he would improve the ditch to permit that to happen, he could not do that to the detriment of the servient property. If that ditch is used for drainage, you would have to put in a culvert. You'd have to put the servient property in the same condition to the benefit of the property owner because now as the case cited by Appleese here regarding that issue, it's clear that one must look at this to the minimum detriment of the servient property, not to the maximum benefit of the dominant property. For example, a warranty deed gives one after acquired title. A quick claim deed does not. The document means what the document means. We can't change that. Now, here we have a written grant of easement. There is some ambiguity as to its width. The court heard a ton of evidence about that issue and came to its conclusion. Is Mr. Fulmer right that there was evidence that at one point it's 26 feet? I think that evidence is to be construed by the court and I think properly was. The driveway at that point, we're talking about the entire driveway for use by the servient property owner, the Lambrights, was that wide at that point. I don't think there's any dispute. We can look at it and see that. But the witnesses don't make statements of law. The fact that they're talking about their driveway and make the wrong comment if that's what they did doesn't make it an easement. It's just a description of what's there. The surveyor can't tell us it's an easement. It's Mr. Phillippe. He can only tell us what he's drawn. That's all he can do. If your case that I recommend to your Honor about the construing the easement strictly, the greatest possible use to the owner of the servient property, also in the Derisa case, all of page 11 of Apley's brief, if the language is clear, that language is not the subject of interpretation. Well, the language is clear as to its use. It's ingress and egress. There was some testimony that the parties initially allowed some turning around. Well, they were related. The testimony is clear. We had a mother-in-law, a mother and mother-in-law of a couple that was purchasing the property from them. That's what created the time of the easement. Well, they also invited them over for dinner. So if they invited them for dinner, does that mean that that increases that right? I mean, when you have a relationship between relatives and subsequently between friendly neighbors, that relationship doesn't create some right. And there's no ambiguity in this as to the use of the easement. And the use of the easement is ingress and egress. They cannot just unilaterally say, we want more space. And even if they had permitted it, if they had said to their neighbors, we will allow this for a while, that doesn't change the easement. All that does is be friendly neighbors. There's no case law that suggests that that's the case. All of the cases cited by the Henelix in this case concern easements that have absolutely no relationship to this case. We have a floating easement. We have an easement by prescription. We have an implied easement. We have an easement by necessity. All of those cases have nothing to do with a written grant of easement. That's exactly what we have here. Could the trial court call it a covenant running with the land? Well, I would like to bring the court's attention. There are actually two issues in this case. One is not appealed. There was a covenant running with the land that had to do with the use of some adjoining  And because of that, the Landbrights, for example, were forced to remove some playground equipment. That's supposed to remain just green? Yeah, something. I mean, I glanced at it because it was totally irrelevant to this issue. But there's no covenant running with the land, at least as far as what's before the court today. It's just purely and simply a written grant of easement. Per the McMahon, Burke, and Dursay decisions, the trial court was required to strictly interpret the clear language of the easement. And the clear language, again, I can't overemphasize that, is ingress and egress. That's it. Here, the trial court, as this court mentioned, bent over backwards to consider all this evidence. Not only that, they gave the parties the right to a written closing argument. And the Hemlicks had the opportunity for a written rebuttal argument. So it's not like they didn't get an opportunity to present the case. The other issue that was not raised by counsel is their alternative argument that somehow they have an easement of necessity for their turning around. There's absolutely nothing that supports that position. I heard nothing. We'll rely on our brief on that. Does that deal with your argument that they could use some of their land at the end of That's great. That's their only way. Was there any evidence presented at the trial court on the feasibility of that, or whether there was any difficulty with their doing so? I'm sorry. I think it was scant. Citing this court's opinion in Weaver v. Cummins, we will not disturb the trial court's manifest way to the evidence for an abuse of discretion. There's nothing cited here by the Hemlicks that would suggest that that's the case. This court clearly held the question of reasonableness as one of fact. And that's what's happening. Your primary argument against the easement of my necessity is It's not necessary. They could do it now on property and turn around and Yeah, and that Did you argue that to the trial judge? I did not argue that. I was not the trial court lawyer. Was it argued to the trial court at that point? Yes. And I don't know if, by the way, having read the record, I don't know if it's argued to the extent we would be arguing it here, the issues of law. But the necessity for a driveway for ingress and egress is clearly much greater than the alleged necessity to use that portion of the driveway as a turnabout. That I mentioned because of the case cited by the Hemlicks in their brief concerning a case that was interpreting what a driveway was for ingress and egress. I don't question that Supreme Court case. That's the Sheehan case. I just question its applicability here. That's all I have. Thank you. With respect to a couple of points here that I think are extremely important, may have been misstated during the previous argument. This easement does run with the land, and it so states on page two of the easement. That is found in Plaintiff's Exhibit 3A11. And that is an extremely important aspect of the case. The easement dated August 11, 1994. The easement herein granted shall run with the land and shall inure to the benefit and use of the grantee his successors and assigns for all times hereafter. Well, Mr. Tietz's point is you've got your easement. It's not obstructed. You can get to and from Lake of the Woods Road. What about the argument that he made you heard on the necessity to broaden it? Because when it ends on your property, why don't you construct a turnaround there? Or just broaden it enough so that you can pull up and make a, whatever it's called, a K-turn or whatever? Well, if the court would conclude that the evidence of actual use and the intent of the parties is not relevant, and the court would further find that the implied easement doesn't work, then they would have no choice. Whether or not there is sufficient space, I can direct the court to two photographs, A29 and A62. These two photographs establish that there's, the lot line is at this fence. There's the concrete approach. There's simply no place to do it. There's a small front yard. They've built a porch on that front yard. And they would have no front yard, and they would still have to do a multi-turnabout to get around. There's simply insufficient space. The other photograph would be A62, excuse me, A62. This shows the wooden fence and how much space that they have there. But when Mr. Teach stated that the encroachments have been removed, that one hasn't. The wooden fence that is marked as A61, so that becomes a question of interpretation. Is that on the easement? It's right in the middle of the easement, Your Honor. So you can't use the road? We can't use that gravel road at all, but the little sliver that Judge Leonard gave us along the east side of it. So when you ask the question, have the encroachments been removed? Maybe I'm not being clear on my question. Does that fence block the driveway going from your clients to the lake of Woods Road? No, it allows them 10 foot, but that abuts the plaintiff's lot to the point so far east that they can only use less than a third of their concrete approach. If the easement doesn't take a vehicle from the road to the garage, something's not right. And that's what we have. So yes, according to the judge's order, that fence is not blocking the easement. It's up to one inch, right where David Phillippe stated, according to the judge's order. And so it becomes a question of, you first got to decide what the easement should be, and then determine whether or not the encroachments have been removed. And this has been going on with changing encroachments for years, since 2007. Did the trial court conduct a personal view of the property? No, he did not. And for this reason, I admitted quite a few exhibits by agreement. Was he requested to do so? No, he was not. So he would have had to done it sua sponte? I'm sorry? He would have had to make this decision on his own? No one asked him to come out and look at the property? Well, with the degree of aerial photographs that were admitted by agreement, and the different angles, I decided it wasn't necessary. And as busy as Judge Leonard is, I didn't want to bother him with that. A couple of other points, with respect to- Well, counsel, your time is up. We'll take this matter under advisement. Thank you.